**E-FILED**
Friday, 30 September, 2005  09:15:07 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ASIF KADIANI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-3236 |
| | ) | |
| KM2 DESIGN GROUP, P.C., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant KM2 Design Group, P.C.'s (KM2) Motion for Summary Judgment. Plaintiff Asif Kadiani has alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). His Amended Complaint (d/e 20) consisted of seven counts. Plaintiff voluntarily dismissed Counts II and V of the Amended Complaint which had claimed discrimination on the basis of national origin.[1] His remaining counts allege that Defendant: (1) denied him the same vacation benefits as those given to employees who shared the same

---

[1]Counts IV and VII appear also to raise claims of national origin discrimination, but they are still pending.

1

religious belief (Baha'i) as KM2's sole shareholder, Bedi Mesbah (Count I);
(2) demoted him because of his religious beliefs and reduced his
responsibility and duties by hiring Abbas Lohrasbi (Count III); (3) retaliated
against him, after he complained about the hiring of Lohrasbi, by demoting
him to a lower position (Count IV); (4) constructively discharged him
because of his religious beliefs (Count VI); and (5) retaliated against him by
denying Plaintiff payment for his accumulated vacation time when he
resigned (Count VII).  For the reasons set forth below, the Court finds that
issues of fact exist concerning Kadiani's claim that he was discriminated
against because of his religious beliefs when Defendant hired Abbas
Lohrasbi and reduced Kadiani's duties and responsibilities.  The Motion is
otherwise allowed.

## STATEMENT OF THE FACTS

For purposes of summary judgment, any dispute as to the relevant
facts will be viewed in the light most favorable to the plaintiff.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

On February 1, 1993, Kadiani began working for KM2, as an
engineer, with an annual salary of $45,000.  Upon being hired, Plaintiff
received an Employee Handbook (Handbook) that set forth, among other

things, KM2's employee benefit policy. It provided that new employees will earn 10 days of vacation each year, and after five years of service, KM2 employees will earn 15 days of vacation per year. The Handbook also contained a disclaimer. In relevant part, that policy provided:

### Introductory Statement

> No employee handbook can anticipate every circumstance or question about policy. As KM2 Design Group continues to grow, the need may arise and KM2 Design Group reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate, in its sole and absolute discretion. The only exception to any changes is our employment-at-will policy permitting you or KM2 Design Group to end our relationship for any reason at any time. Employees will, of course, be notified of such changes to the handbook as they occur.

Defendant's Motion for Summary Judgment (d/e 33), Exhibit F.

In September 1998, Kadiani resigned from KM2 and began working for the Facilities Department at the University of Illinois. Two weeks later, Kadiani returned to KM2 as a Mechanical Department Head, with his salary increasing from $56,500 to $75,000. Defendant's Reply in Support of its Motion for Summary Judgment (d/e 36), Affidavit of Bedi Mesbah (Mesbah Affidavit), p. 1. The parties dispute the exact reasons for Kadiani's return to KM2. Mesbah claims that Kadiani returned and asked for his job

back because he not only felt discriminated against by the University, but because he also did not believe he could find any place as accepting as KM2. Id. Kadiani, however, denies this.  Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (d/e 34), Affidavit of Asif Kadiani (Kadiani Affidavit), ¶ 4.  He states that he returned to KM2 because Mesbah agreed to raise his salary.

Starting around the mid-1990s, Mesbah began inviting Kadiani and his wife, Rashida, to a few Baha'i religious gatherings at the Baha'i Center and dinners at Mesbah's house at which religion was discussed.  Mesbah is a Baha'i, and Kadiani is a Muslim.  Kadiani never protested against going to the above events.   Defendant's Motion for Summary Judgment, Deposition of Asif Kadiani (Kadiani Deposition), p. 55.  He and his wife went to about four meetings in total, which included two dinners at Mesbah's house with other Baha'i members and two meetings at the Baha'i Center.  Id.  Deposition of Rashida Kadiani (Rashida Deposition), p. 28. Kadiani and Rashida both testified that Mesbah made some statement regarding their faith at these meetings.  Rashida testified, in part, as follows:

> Bedi said Muslim faith -- let me -- the sun has set on the Muslim faith and now this is a new time, new era.  There is another sun, the sun has risen somewhere else, and so you

should following that new -- the new era or times or whatever. But he said my Muslim faith, the sun has set.

Id. at 16.

Kadiani states that the efforts by Mesbah to invite Kadiani to attend these meetings ended around 2000 or 2001, when Kadiani returned a copy of the Baha'i Holy Book to Mesbah, thanking him for the book. Kadiani Deposition, pp. 55, 61. Further, he states that Mesbah "backed off" from the invitation to the Baha'i gatherings around 1998 or 1999; however, Kadiani is uncertain of the exact time. Id. at 56. Rashida, on the other hand, testified that the meetings were all held before the end of 1997. Rashida Deposition, p. 18. Kadiani never once complained about going to these meetings or about Mesbah's alleged attempt to convert him. Kadiani Deposition, p. 60. Mesbah testified that he probably made a general invitation to his employees to come to these gatherings, but he does not recall specifically asking Kadiani to attend the meetings. Defendant's Motion for Summary Judgment, Deposition of Bedi Mesbah (Mesbah Deposition), p. 30. Some time after Kadiani stopped going to these events, he was given a raise. Indeed, Kadiani testified:

> Q.  These -- after you quit going to these meetings did you receive any increases in pay and promotions?

A.  Yes.

Kadiani Deposition, p. 62.

In late 2000, Mesbah offered Kadiani an opportunity to become a partner at KM2, but Kadiani refused the offer.  Kadiani Deposition, p. 89. The record is unclear as to the exact price that Mesbah proposed for Kadiani to pay to buy into the company.

Mesbah claims that, although Kadiani was an excellent engineer, he realized over time that Kadiani lacked the managerial and supervisory skills necessary for his position as Vice President of the Mechanical Department. Mesbah Deposition, p. 48.  Mesbah asserts that he had several informal conversations with Kadiani regarding his concerns that Kadiani was lacking managerial skills.  Kadiani denies this.

On July 1, 2001, Mesbah hired Abbas Lohrasbi as Operations Manager.  Mesbah testified that Kadiani's responsibility was to manage the Mechanical Department while Lohrasbi's responsibility was the overall office operations' management. Mesbah Deposition, p. 60.  When Lohrasbi was hired, Kadiani continued to receive his same salary ($75,000), which was $10,000 more than Lohrasbi's salary, and maintained his title as Vice President of the Mechanical Department.  Mesbah Affidavit, ¶ 1.  Plaintiff,

however, asserts that Lohrasbi was hired as Director of Operations rather than Operations' Manager because the Handbook does not mention the latter.  He sates that, until Lohrasbi came on board, he was the Director of Operations.  Kadiani states that this changed when Lohrasbi was hired. Kadiani Deposition, p. 81.  Kadiani further notes that, when Lohrasbi began working at KM2, Kadiani was stripped of his position and his responsibilities were largely performed by Lohrasbi.  He claims that he lost authority over people; he lost the ability to represent the firm in the marketplace; his directives to subordinates were being overruled by Lohrasbi; he was being relieved of responsibility for evaluating his subordinates; and he was being subjected to criticism and questioning by Lohrasbi in front of his subordinates.  Kadiani Deposition, pp. 81-85.  In addition, Kadiani testified that he lost little perks and benefits that came along with his job.  Id. at 83.

Kadiani states that Lohrasbi was unqualified for his position and was only hired because he is a Baha'i.  Kadiani further asserts that Lohrasbi was not a licensed professional engineer like he was.  Kadiani Deposition, p. 78. Referring to Lohrashi's resume, Mesbah testified that Lohrasbi is a mechanical engineer, with a Bachelor's and Master's Degrees in Mechanical

Engineering from Tennessee Tech University and with 22 years of experience in engineering and management. <u>Mesbah Affidavit</u>, ¶ 1.

In June 2001, KM2 reissued the Handbook containing the terms and conditions of employment relating to the vacation benefit program and confirmed the policies previously stated therein.

On September 6, 2001, KM2 received the Hospital Sisters Project, one of the largest contracts KM2 had at the time. The Hospital Sisters Project involved designing new buildings and renovating existing buildings for a new client, the Order of St. Francis, an order of Roman Catholic nuns that owns and operates St. John's Hospital in Springfield, Illinois. <u>Mesbah Affidavit</u>, ¶ 3. Mesbah claims that Kadiani refused to take on the project because it was a religious project, although Kadiani did the initial work on the project. Mesbah notes that he is uncertain as to exactly when Kadiani refused to work on the project. Kadiani denies that he refused to continue with the project because it was a religious project. <u>Kadiani Affidavit</u>, ¶ 7. John Fletcher, Senior Mechanical Designer at KM2, testified that Kadiani was his immediate supervisor and that he did not recall any instances in which Kadiani refused to work on a project because of the client's religious background. <u>Plaintiff's Memorandum of Law in Opposition to Defendant's</u>

Motion for Summary Judgment (d/e 34), Exhibit 4, Deposition of John

Fletcher (Fletcher Deposition, p. 10.

On September 7, 2001, Kadiani resigned from KM2.  His September

7, 2001, resignation letter stated:

> Over this long period at KM2, I am now convinced that
> factors other than merit play a decisive role but I for one am
> not prepared to accept that condition.  While I have done my
> best in my capacity to date, I suppose my efforts were no
> good, not good enough or perhaps I just did not bear the
> right personal attributes.

Kadiani Deposition, p. 103.  Kadiani states that the resignation letter was

his way of protesting against Mesbah's hiring of Lohrasbi and his role in

KM2.  Over the next weekend, Kadiani states that he decided  to resume

working at KM2 as a result of a conversation he had with Mesbah.

Kadiani and Mesbah's accounts differ as to exactly what happened

during this meeting.  Mesbah states that "by the end of the day, Kadiani

came in and apologized , asking for his resignation back."  Defendant's

Motion for Summary Judgment, ¶ 11.  Kadiani's account, however, is

different.   Kadiani's account of the conversation between himself and

Mesbah is as follows:

> A.   After I resigned -- this letter was -- I think I gave it to
>      him on a Friday.

Q.  Uh-huh.

A.  And I obviously did not want to leave with things undone, so I went in on the weekend to get caught up with things, and Bedi Mesbah came into the office and he started talking to me.  He says, "Why did you do all this?". . . And I told him, I said, "You know, I had my discussion with you on Thursday or Friday and I asked you pont-blank is Abbas Lohrasbi my supervisor.  And you said yes."  And I said, "That was enough for me."  "Oh, oh, you misunderstood the whole thing.  No, that is not what I intended.  That is really not what I intended."  I said, "Then are you saying that, you know, he is not my supervisor?"  No, no, he is not my supervisor.  I said, "Then, what is his responsibility and do I supervise him for engineering tasks?"  He says, "Yeah, you can -- you can give him small engineering tasks, you know."  And that was the end of the conversation.  And it was like, you know, it was a misunderstanding on my part when he clearly told me, and I gave him the benefit of the doubt and I continued, you know, hoping that, you know, he would see reality and it would dawn on him at that point.

Kadiani Deposition, pp. 104-105.

On September 14, 2001, Kadiani received a performance evaluation that he himself filled out and reviewed with Mesbah.  Kadiani's evaluation indicated that he was exceeding Mesbah's expectations on seven out of ten graded areas; meeting expectation in two areas; and receiving an acceptable score in another area, with the possible grades being acceptable and unacceptable.   Plaintiff's Memorandum of Law in Opposition to

Defendant's Summary Judgment Motion, Exhibit 2, KM2 Design Group
P.C. Employee Performance Rating for Asif Kadiani.  The evaluation made
no indication that Kadiani did not meet Mesbah's expectations.   After
Mesbah met with Kadiani to go over the evaluation, Mesbah did not make
any changes to the evaluation before it was placed in Kadiani's personnel
file.   Mesbah Deposition, pp. 48, 51.   However, Mesbah states that,
although no formal entry was made in Kadiani's file regarding the
management issues, he spoke with Kadiani about his concerns on several
occasions regarding the management issues that the company was
experiencing because of Kadiani.  Id. at 48-49.  Kadiani denies having had
any discussions with Mesbah about his inability to properly perform his
managerial and supervisory duties.

In November 2001, Kadiani received a raise in salary to $80,000 per
year.  Mesbah Deposition, p. 51.  The raise was a result of a cost of living
adjustment.  Id.  In March 2002, Mesbah states that he called Kadiani into
his office because of his growing concerns about Kadiani's refusal to
consistently cooperate at the workplace, which contributed to the disunited
atmosphere in the office and poor quality of service.  Mesbah Affidavit, ¶ 3.
At this meeting, Mesbah claims that he asked Kadiani what his future plans

were.  Further, he told Kadiani that, because he needed stability in the Mechanical Department and because he could no longer count on Kadiani to provide this, he would have to look for someone else to run the Mechanical Department.  Id.  Kadiani, however, denies that he was uncooperative and that he discussed his future plans with Mesbah at this meeting.  Kadiani Affidavit, ¶ 9.  Fletcher testified that Kadiani had good customer relations skills.  Fletcher Deposition, pp. 18-19.

In early August 2002, Mesbah claims that he had another long talk with Kadiani, asking him what his plans were, and that Kadiani, in turn, stated that he was looking for a job as facility manager.  Mesbah states that he told Kadiani that if he wanted to maintain his position as the Mechanical Department Head until he found a job, he would have to devise a plan, describing how he would manage and run his department more efficiently.  Kadiani, however, denies that he discussed his future plans with Mesbah.  Kadiani Affidavit, ¶ 9.

Sometime in August 2002, prior to his resignation from KM2, Kadiani was informed that a clerical employee at KM2, Connie Ohare, a Baha'i, was receiving more vacation time than he was, contrary to what was provided in the Handbook.  Kadiani confronted Mesbah regarding this

issue, but Mesbah refused to give any justification.  <u>Kadiani Deposition</u>, p. 23.

On August 23, 2002, Kadiani claims that he had a discussion with Mesbah in which he complained about Mesbah's act of hiring and retaining Lohrasbi.  <u>Kadiani Deposition</u>, p. 98.  Kadiani testified as follows:

Q.   What did you tell Bedi Mesbah about initially?

A.   Well, I asked him about Abbas Lohrasbi and what his job -- what his functions are, what his skills are.  I even asked him about is he part of the design team and I was told no.  I said you know, "what exactly is he doing here?"  I was never given answer to that.

* * *

Q.   Okay.  So you --

A.   At that point, I told him, I said, "What does he have and why is he not being disciplined?

Q.   This is August 2002?

A.   Yes, August 2002.

<u>Id.</u> at 99-101.

On August 27, 2002, Mesbah called Kadiani into his office again and asked him if he had devised an action plan to efficiently manage and run his department.  Mesbah claims that Kadiani had nothing to offer.  Kadiani,

again, denies this.  On August 28, 2002, Kadiani was informed that he would be demoted to Senior Project Engineer with a salary of $60,000 until he found the job he was searching for in facilities management. Immediately thereafter, Kadiani resigned from KM2.

## ISSUES PRESENTED

Kadiani claims in Count I that KM2 discriminated against him on the basis of his religion by giving preferential treatment with respect to vacation to Baha'i employees, particularly Connie Ohare, a clerical employee.  He claims in Count III that he was given lesser job responsibilities when he expressed no intent in becoming a Baha'i and was later demoted to Senior Project Engineer with a pay cut of 25 percent because of his different religion (Muslim) than Mesbah's (Baha'i).  He also claims in Count III that, upon the hiring of Lohrasbi, he was stripped of his duties.  He claims in Count IV that he was demoted in retaliation for complaining that Mesbah had hired an unqualified Iranian engineer.  He claims in Count VI that KM2 constructively discharged him when it hired a less competent person to take over his job, showed favoritism to other Baha'i employees, failed to answer his complaints regarding the alleged discrimination, and demoted him to a position that led to a substantial

salary decrease.  He claims in Count VII that, because he complained to Mesbah about the hiring of Lohrasbi, KM2 retaliated against him by denying him payment for his accumulated vacation time when he resigned. Defendant seeks summary judgment on all counts.

At summary judgment, the movant must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986).  The Court must consider the evidence presented in the light most favorable to the non-moving party. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  Anderson 477 U.S. at 255.  Once the moving party has produced evidence showing that it is entitled to summary judgment, the non-moving party must present evidence to show that issues of fact remain. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Based on the evidence presented, genuine issues of material fact only exist as to part of Count III.

## Counts I & III

Counts I and III allege religious discrimination under Title VII. Count I alleges that KM2 discriminated against Kadiani on account of religion when Mesbah gave preferential treatment, with respect to vacation

time, to employees practicing the same religion as that of Mesbah. Count III alleges that KM2 discriminated against Kadiani by demoting him, with a 25 percent decrease in salary, because of his religious beliefs. Count III also alleges that Kadiani was discriminated against because of his religious beliefs when Defendant hired Lohrasbi and substantially reduced his duties and responsibilities. Kadiani admits that there is no direct evidence to prove that KM2 engaged in intentional religious discrimination; he relies on the indirect method of proof instead. Rather than using the traditional McDonnell Douglas burden shifting analysis, Kadiani proceeds with a more flexible indirect standard applied by the Seventh Circuit. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Sattar v. Motorola, 138 F.3d 1164, 1169 (7th Cir. 1998). Because the elements of this latter method fit more aptly with the facts of the present case, the Court will proceed under this alternate method.

In order to make out a prima facie case when the plaintiff alleges that he was discriminated against because he did not share certain religious beliefs held by his supervisors, the plaintiff must establish that: (1) he suffered an adverse employment action; (2) his job performance rating was satisfactory at the time the employment action was taken; and (3) some

additional evidence exists suggesting that the employment action was taken as a result of the employee's failure to adhere to his employer's religious beliefs. Sattar, 138 F.3d at 1169. An adverse employment action is a materially adverse change in the terms and conditions of employment. Murray v. Chicago Transit Authority, 252 F.3d 880, 887 (7th Cir. 2001). A materially adverse change includes a demotion, a decrease in wage or salary, a less distinguished title, a material loss of benefits, or material reduction in responsibilities. Oest v. Illinois Dept. of Corrections, 240 F.3d 605, 612-613 (7th Cir. 2001).

The extra vacation benefits that Ohare received and other alleged preferential treatment afforded to other Baha'i employees do not constitute an adverse employment action against Kadiani. The fact that one employee received additional vacation did not materially change Kadiani's salary, title, duty or other working conditions. "[N]ot everything that makes an employee unhappy" or annoyed is an adverse employment action. Bernstein v. Bd. of Education of School District 200, 191 F.3d 455 (7th Cir. 1999) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)). "Nor does every 'mere inconvenience or alteration of job responsibilities'" amount to an adverse employment action. Id. (citing Fortier v. Ameritech Mobile

Comm. Inc., 161 F.3d 1106, 1112 (7th Cir. 1998)).  Although the news of

a clerical employee being offered a more generous vacation benefit could

have made Plaintiff upset and unhappy, such evidence alone is not enough

to establish that he suffered an adverse employment action.  In addition,

Ohare was not in a comparable position with Kadiani.  Kadiani, therefore,

cannot make out a prima facie case with respect to Count I.

With respect to Count III, Kadiani's demotion on August 28, 2002,

which corresponded with a 25 percent cut in his salary, does constitute an

adverse employment.  Moreover, Kadiani claims that, upon the hiring of

Lohrasbi in July 2001, he was unable to exercise authority or exert influence

over his subordinates, unable to represent the company in the marketplace,

and unable to give performance evaluations to his subordinates.  These

changes in his duties and responsibilities could also amount to a material

adverse change in the terms and conditions of employments.  Kadiani has

thus demonstrated that he suffered adverse employment actions.

The second prong of the Sattar test asks whether Kadiani's

performance was satisfactory at the time the adverse employment actions

were taken.  Both Plaintiff and Defendant's accounts differ regarding

whether Kadiani's performance was satisfactory at the time he was demoted

in August 2002.  It has been concluded that in order to establish this prong "isolated comments by co-workers regarding a plaintiff's abilities do not demonstrate that he is a stronger performer than other candidates." Rabinovitz v. Pena, 89 F.3d 482, 487 (7th Cir. 1996) (citing Sirvidas v. Commonwealth Edison Co., 60 F.3d 375, 378 (7th Cir. 1995)).  Further, Plaintiff's "own opinions about his performance or qualifications [do] [not] give rise to a material factual dispute." Pena, 89 F.3d at 487 (citing Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 481 (7th Cir. 1995)). More importantly, however, the time frame critical to this issue is the time when the adverse employment action occurred.  Moser v. Indiana Dept. of Corrections, 406 F.3d 895, 901 (7th Cir. 2005).  Indeed, "earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken." Id. (quoting Fortier, 161 F.3d at 1113).

Kadiani argues that he was performing his job duties satisfactorily at the time he was demoted in August 2002.  To support his contention, Kadiani refers to the September 14, 2001, performance evaluation in which he received high marks.  Kadiani argues that, had his managerial and supervisory skills been a growing concern to Mesbah, then Mesbah would

have formally included this in Kadiani's personnel file in 2001.  However, Mesbah did not make any changes to the evaluation form after he went over it with Kadiani.  The September 14, 2001, performance evaluation, however, is not timely because the demotion took place almost one year after this evaluation was given.

Moreover, while Kadiani argues that he was meeting KM2's expectations in August 2002, he fails to provide any concrete evidence.  As noted earlier, Kadiani's own assertions and opinion regarding his performance are not sufficient.  Kadiani also provides the testimony of his subordinate, Fletcher, who stated in his deposition that Kadiani had good customer relations' skills and that he did not recall Kadiani refusing to work on a project because of the religious affiliation of the client.  Such isolated statements by a co-worker are insufficient to prove that Kadiani was satisfactorily meeting the expectations of Mesbah.  Kadiani has failed to provide sufficient evidence to show that he was satisfactorily performing his job at the time of his demotion in August 2002.

The analysis of the other adverse employment action, the material reduction in Kadiani's job responsibilities after the hiring of Lohrasbi, is different, however.  In this claim, unlike Kadiani's demotion claim, the

September 14, 2001, evaluation is critical. Mesbah hired Lohrasbi on July 1, 2001. Kadiani lost responsibilities and duties at that time. In his performance evaluation two months later, Kadiani received high marks, which were not modified after Mesbah reviewed the performance evaluation with Kadiani. The evidence suggests that Kadiani was satisfactorily performing his job at the time of the reduction in his responsibilities. Thus, he meets the first two prongs of the Sattar test with respect to the claim of discrimination in reducing his job responsibilities following the hiring of Lohrasbi.

The third element of the test, which calls for additional evidence establishing a discriminatory motive for the adverse employment action, is basically equivalent to the first and the fourth prongs of the traditional McDonnel Douglas test. Sattar, 138 F.3d at 1169. These prongs require the plaintiff to prove that: (1) he is a member of a protected class and (2) he was treated less favorably than a similarly situated employee outside his protected class, respectively. Id. The "similarly situated" prong requires that the plaintiff identify an employee who is "directly comparable in all material respects." Ineichen v. Ameritech, 410 F.3d 956, 960 (7th Cir. 2005) (citing Sartor v. Spherion Corp., 388 F.3d 275, 279 (7th Cir. 2004)).

"This requires the plaintiff to show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no 'differentiating or mitigating circumstances as would distinguish. . . the employer's treatment of them.'" Id. at 960-61.  (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)).

Kadiani, in claiming that he is a Muslim and that Lohrasbi was afforded preferential treatment because he is a Baha'i, satisfies the first prong of the third element of the Sattar test.   Lohrasbi is directly comparable to Kadiani in all material respects.  Kadiani and Lohrasbi both reported directly to Mesbah.  Also, Kadiani alleges that Lohrasbi supplanted him as Director of Operations/Chief Engineer, the position that Kadiani previously held.  Kadiani states that Lohrasbi effectively stripped him of his duties by overruling the former's directive to subordinates, thereby limiting both his authority and his ability to represent the company in the market. The evidence shows that both Kadiani and Lohrasbi engaged in the similar work.  In addition, the evidence suggests that Lohrasbi possessed similar qualifications to Kadiani.  Although Lohrasbi was not a professional license engineer, he was a mechanical engineer with a Bachelor's and Master's in

Mechanical Engineering, as well as 22 years of engineering and management experience.   Kadiani is a professional licensed engineer, with Master's degrees in Mechanical Engineering and Business Administration and almost 10 years of experience in engineering.   Finally, evidence exists that Mesbah hired Lohrasbi shortly after Kadiani returned the Baha'i Holy Book to Mesbah and apparently expressed no desire to convert to the Baha'i faith. Thus, Plaintiff satisfies the second prong of the third element of the <u>Sattar</u> test.

Once the Plaintiff proves all the elements of the test, the Court must consider whether KM2 has pointed to a non-discriminatory reason for its action.  If it does, then the burden shifts to Plaintiff to present evidence that KM2's stated reason is a pretext for discrimination.   <u>Sattar</u>, 138 F.3d at 1170.   "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks."  <u>Grayson v. O'Neill</u>, 308 F.3d 808, 819 (7th Cir. 2002). To satisfy this prong, Plaintiff must establish that the Defendant's non-discriminatory reason for its actions either: "1) had no basis in fact; 2) did not actually motivate its decision; or 3) was insufficient to motivate its decision."  <u>Id.</u> at 819-20.

Mesbah argues that he hired Lohrasbi on July 1, 2001, to deal with some of the management problems resulting from Kadiani's inability to perform his managerial duties satisfactorily.  This constitutes a non-discriminatory reason for hiring Lohrasbi, and the burden shifts to Kadiani to show that this reason is a pretext for discrimination.

Kadiani points to his September 14, 2001, performance evaluation, which was not modified by Mesbah after his review of it, as evidence that he was meeting Mesbah's expectations.  Specifically, Kadiani's evaluation indicated that he was exceeding Mesbah's expectations on seven out of the ten graded areas, meeting expectations in two areas, and receiving an acceptable score in another area, with the possible grades being acceptable and unacceptable.  Therefore, Kadiani argues that Mesbah's reason for hiring Lohrasbi is pretextual.

Based on the evidence, a jury could conclude that Mesbah's proffered reason for hiring Lohrasbi is a pretext for discrimination and that Mesbah's concerns regarding Kadiani's lack of managerial ability did not actually motivate his decision to hire Lohrasbi.  A jury could further conclude that if Kadiani's lack of managerial and supervisory skills were a growing concern for KM2, Mesbah would have so indicated in Kadiani's September 14,

2001, performance evaluation.  Because Mesbah failed to do so, issues of fact exist as to Count III with respect to the claim of discrimination stemming from the reduction in Kadiani's job responsibilities after Lohrasbi was hired.

<u>Count IV</u>

Title VII prohibits any employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter or. . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under the statute.  42 U.S.C. § 2000e-3(a).  In order to establish a <u>prima facie</u> case of retaliation, a plaintiff can prove his case under the direct or the indirect method of proof.  <u>Stone v. City of Indianapolis Public Utilities Div.</u>, 281 F.3d 640, 644 (7th Cir. 2002).  Under the direct standard, the plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) he was subject to an adverse employment action; and (3) a causal connection exists between the first two prongs.  <u>Sitar v. Indiana Dept. of Transp.</u>, 344 F.3d 720, 727 (7th Cir. 2003).  Under the indirect method, the plaintiff must prove that: (1) he engaged in a statutorily protected activity; (2) he satisfactorily met the expectation of his employees with respect to job

performance; (3) despite his satisfactory job performance, he suffered an adverse employment action; and (4) he was subject to less favorable treatment than other similarly situated employees.  Id.

To invoke Title VII retaliation protection under either method, a person must engage in a protected activity.

> Although an employee need not use the magic words "sex" or "gender discrimination" to bring her speech within Title VII's retaliation protections, she has to at least say something to indicate her [gender] is an issue.  An employee can honestly believe she is the objection of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.

Sitar, 344 F.3d at 727.

Regardless of which standard Kadiani applies, his retaliation claim fails because he did not engage in any protected activity recognized by Title VII.  There is no evidence that Kadiani ever engaged in any protected activity under Title VII.  Kadiani points to three alleged incidents where he claims that he protested to Mesbah concerning the religious discrimination he was experiencing.  He first refers to the September 7, 2001, resignation letter in which he stated: "Over this long period at KM2, I am now convinced that factors other than merit play a decisive role but I for one am

not prepared to accept that condition."  Kadiani Deposition, p. 103.  The letter is vague and oblique and says nothing to suggest that Kadiani was resigning due to religious discrimination he had been allegedly suffering. The letter in fact ends by stating: ". . . I suppose my efforts were no good, not good enough or perhaps I just did not bear the right personal attributes."  Kadiani Deposition, p. 103.  Further, this letter preceded the only action articulated in Count IV as the protected conduct -- notably Kadiani's verbal complaint to Mesbah about his discriminatory conduct in hiring Lohrasbi, an "Iranian who was unqualified to work as an engineer for Defendant."  Amended Complaint, Count IV, ¶ 8.

Kadiani next points to his conversation with Mesbah when he came in the office on September 7, 2001, the weekend after he submitted his resignation letter to Mesbah.  Kadiani alleges that he complained to Mesbah about the hiring of Lohrasbi during this conversation.  However, even taking the conversation as recalled by Kadiani, there was no mention of alleged discrimination Kadiani was experiencing at work.  Kadiani claims that he told Mesbah that "[he] [knew] exactly what's going on" and that "[t]his is a sensitive matter."  Kadiani Deposition, p. 107.  Again, this conversation is oblique and is not sufficient to prove that Kadiani engaged in protected

activity.  Moreover, even though Kadiani claims that he decided to resign because of the unjustifiable religious discrimination, he changed his mind after talking to Mesbah and clarifying whether he reported to Lohrasbi; he then returned to work at KM2.

Kadiani then refers to his conversation with Mesbah on August 23, 2002, as evidence he engaged in a statutorily protected activity.  Even during that conversation, Kadiani never mentioned that he was protesting against KM2's preferential treatment of Baha'i employees.

Kadiani finally points to his filing of complaints with the Equal Employment Opportunity Commission (EEOC) regarding this alleged discrimination.  However, Kadiani's demotion occurred before his filing of the EEOC complaint.  Therefore, his demotion could not have been in retaliation for this protected activity, which came after the adverse employment action.  Kadiani failed to present any evidence that he engaged in protected activity that would invoke the protections of Title VII.  He, therefore, cannot make out a prima facie case of Title VII retaliation.  KM2 is entitled to summary judgment on the retaliation claim in Count IV.

<u>Count VI</u>

Kadiani claims in Count VI that he was constructively discharged on

28

August 28, 2002.  Constructive discharge occurs if working conditions are so intolerable as a result of unlawful conduct that a reasonable person would be forced into an involuntary resignation.  <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129 (2004); <u>Vitug v. Multistate Tax Com.</u>, 88 F.3d 506, 517 (7th Cir. 1996).  The conditions must be worse than an ordinary hostile work environment because, "in the 'ordinary' case, an employee is expected to remain employed while seeking redress."  <u>Tutman v. WBBM-TV, Inc./CBS, Inc.</u>, 209 F.3d 1044, 1050 (7th Cir. 2000) (internal quotations omitted).

Kadiani argues that he resigned because: (1) a clerical employee, who is a Baha'i, was receiving extra vacation benefits; (2) other Baha'i employees were receiving preferential treatment; (3) Lohrasbi, who is unqualified, was hired as Director of Operations, stripping Kadiani of his duties; and (4) he was demoted to Senior Project Engineer, with a 25 percent decrease in salary.  None of the alleged preferential treatment of other Baha'i employees made Kadiani's workplace worse than the ordinary case of a hostile work environment.  It is irrelevant whether a clerical employee, who is different in all respects from Kadiani, the Head of the Mechanical Department, gets extra vacation benefits.  There is no pattern of any other discriminatory

treatment to which Kadiani was subjected.  Kadiani was never deprived of any promotional opportunities.  Rather, Kadiani was twice rehired after his resignation, once with a raise.  The is no evidence that Kadiani was denied any employee benefits.  He never asked Mesbah for extra vacation benefits and therefore was not denied of any benefits.  See Weissman v. Michael Reese Hospital and Medical Center, 932 F.2d 971 (7th Cir. 1991).

Further, the hiring of Lohrasbi did not make Kadiani's working conditions so intolerable as to conclude that constructive discharge occurred.  Finally, demotion, which corresponded with a loss of pay, is not so egregious as to constitute constructive discharge.  Kadiani's demotion did not make his working conditions so intolerable that he had to quit before challenging the alleged discrimination.

Kadiani was not constructively discharged.  KM2 is entitled to summary judgment on this claim.

## Count VII

Count VII alleges that KM2 retaliated against him by denying him the money owed him from accrued vacation time upon his resignation. Kadiani argues that he engaged in protected activity by filing a complaint with the EEOC on September 23, 2002.  However, Kadiani failed to provide

any evidence as to whether this denial by KM2 of payment for Kadiani's accrued vacation time occurred before or after the filing of the EEOC complaint.  Further, Kadiani has not provided any facts to support his claim that the alleged denial was motivated by a retaliatory animus.   He, therefore, does not have direct evidence of retaliation.

Kadiani has also failed to prove an indirect <u>prima</u> <u>facie</u> case of retaliation because he did not identify other, similarly situated employees afforded more favorable treatment.  He has not identified any other former Baha'i employee who was paid accumulated vacation at his termination. Therefore, KM2 is entitled to summary judgment on this claim.

<u>CONCLUSION</u>

THEREFORE, Defendant's Motion for Summary Judgment (d/e 33) is ALLOWED in part and DENIED in part.  Partial summary judgment is entered in favor of KM2 and against Asif Kadiani with respect to Count I, IV, VI, and VII of the First Amended Complaint.  The Motion is denied with respect to that part of Kadiani's claim in Count III that he was discriminated against because of his religious beliefs when Defendant hired Lohrasbi and reduced Kadiani's duties and responsibilities.  The Motion is allowed with respect to the balance of the claims in Count III.

IT IS THEREFORE SO ORDERED.

ENTER:   September 28, 2005.

FOR THE COURT:

_____ s/  Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE